MARVIN, Judge.
In this action expropriating property in 1974 for the 1-220 interchange at Swan Lake Road in Bossier parish under the quick-taking statute, the State appeals a judgment that awarded the landowner $92,-923 in addition to the amount the State deposited for the taking ($107,136). LRS 48:441 et seq.
On the original appellate hearing, two of the three judges agreed with the State’s contention that severance damages should not have been awarded because the completed interstate loop conferred “special benefits” to the remainder of the landowner’s property.
After reargument before a five-judge panel that is mandated by LSA-Const. Art. 5, § 8B, we find the State did not prove a special benefit to the landowner’s remaining properties and affirm the judgment.
FACTS
The State expropriated 65.473 acres in 10 separate parcels, effectively dividing the landowner’s remaining 398.3 acres as follows: Tract 1 (SW quadrant), 81.8 acres; Tract 2 (SE quadrant), 138.2 acres; Tract 3 (NE quadrant), 172 acres; Tract 4 (NW quadrant), 6.3 acres. The landowner owned an additional but unaffected 330 acres that were not contiguous to the 398.3 acres. Improvements were located on both the expropriated acreage and the surrounding 398.3 acres.
This plat shows the acreage remaining in the four tracts affected by the expropriation:
[[Image here]]
The trial court awarded:
Value of land taken $143,400.
Value of improvements taken 9,259.
Severance damages 47,400.
Four appraisers submitted appraisal reports and testified as experts: Harvill and Montgomery for the landowner; Willet and Dupree for the State.
*24 VALUE OF LAND AND IMPROVEMENTS TAKEN
This expropriation occurred in 1974. The State is required to compensate landowners for the fair market value of taken property. State, Department of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964). The four experts valued the expropriated acreage and the improvements thereon as follows:
LAND IMPROVEMENTS
Mr. Harvill $143,440. $5,400.
Mr. Montgomery 181,551. 10,940.
Mr. Willet 107,709. 9,759.
Mr. Dupree 104,401. 4,769.
The court essentially accepted Harvill’s estimate for land value and Willet’s estimate for the value of improvements. The four experts used comparable sales to arrive at an estimate of the land value.
Trial courts are given much discretion in evaluating the testimony of appraisal experts. We do not overturn the findings of the lower court unless the findings are found to be clearly erroneous. State, Department of Highways v. McPherson, 261 La. 116, 259 So.2d 33 (1972); State, Dept, of Transp. & Dev. v. Stephenson, 480 So.2d 909 (La.App. 2d Cir.1985). We cannot say that the values found by the trial judge for the properties and improvements were clearly erroneous.
SEVERANCE DAMAGES
Where a taking causes a difference in the value of the landowner’s remaining property before and after the taking, the landowner is entitled to compensation to the extent the difference in value is not offset by “special benefits.” See State, Dept, of Hys. v. William T. Burton Indus., Inc., 219 So.2d 837 (La.App. 3d Cir. 1969), writ denied; and Tate, Legal Criteria of Damages and Benefits — The Measurement of Taking — Caused Damages to Untaken Property, 31 La.L.R. 431 (1971). Special benefits are distinguished from general benefits. Special benefits affect the landowner’s remaining property specifically because of the direct relationship of the remaining property to the project for which property was taken, while general benefits are benefits that inure to all property owners in the vicinity of the project. Louisiana Highway Commission v. Grey, 197 La. 942, 2 So.2d 654 (1941).
General benefits do not offset damages resulting from the taking because “the citizen whose property is taken cannot be compelled to bear more of the cost of the public improvement and general benefits resulting therefrom than is borne by other property owners whose property is neither taken nor damaged for the public purpose.” Louisiana Highway Commission v. Grey, supra, at p. 660. While the landowner bears the burden of proving damages caused by the taking, the State must prove the existence of offsetting special benefits. State, Dept, of Highways v. Anderson, 356 So.2d 1086 (La.App. 2d Cir.1978).
Damage, if any, to the landowners’ remaining property is determined as of the date of the trial. LRS 48:453, adopted by Act 107 of 1954. Seemingly contrary to the language of this statute, Louisiana courts have instead consistently applied before and after taking values to determine severance damages. State of Louisiana, Through the Department of Highways v. Bray, 511 So.2d 1300 (La.App. 2d Cir.1987). See State, Department of Highways v. Wells, 308 So.2d 774 (La.1975); and Tate, La.L.R., supra. LRS 48:453 was amended to conform to the case law and now reads as follows:
The measure of damages, if any, to the defendant’s remaining property is determined on a basis of immediately before and immediately after the taking, taking into consideration the effects of the completion of the project in the manner proposed or planned.
The trial in this case occurred over a decade after the taking in 1974. Although the record in this case contains detailed recitations of events after the taking and near the time of trial, this evidence does not control the issue of severance damages.
The record clearly supports the trial court’s finding that the taking damaged the *25 landowner’s remaining property. Before the taking, the landowner owned a single tract of more than 400 acres on which his brick home was located and which was divided only by Swan Lake Road. The interstate highway loop and diamond exchange created at Swan Lake Road clearly limited the landowner’s access to his property and divided it into four tracts. Unlike Swan Lake Road, which could be traversed at any point, 1-220 is a limited access highway. The taking also caused the landowner the loss of substantial frontage on Swan Lake Road.
Harvill calculated the loss of access frontage of the remaining tracts and the reduction in value caused thereby, to reach these severance damages:
[[Image here]]
The trial judge apparently deemed that Harvill considered special benefits. Harvill did not, however, expressly refer to a specific dollar amount representing special benefits which he would have subtracted from the amount of total damages. Montgomery found $101,642 in “severance damages,” but it appears that he did not consider any special benefits in arriving at this figure. Nonetheless, it is the State and not the landowner that has the burden of proving special benefits. State, Dept, of Highways v. Anderson, supra. The landowner need only show the existence of damages caused his remaining property by the taking, and in this regard, the landowner met his burden of proof.
Willet and Dupree concede that the taking caused damage to the landowner’s property. The State’s experts, however, opined that any such damage was offset by special benefits. The trial court found that the State failed to prove special benefits of an amount sufficient to completely offset damages proved by the landowner to his remaining property.
The testimony and reports of the four experts leave much to be desired in terms of clarity and precision in their terminology respecting severance damages. The State’s experts did not distinguish special benefits from general benefits in their testimony about enhanced value.
When asked whether he found any severance damages, Dupree responded as follows: “Since the value after was more than the value before, in my opinion there was no severance damages.” This is not the test for the determination of severance damages. Every enhancement from the project is not to be considered when estimating the before and after value of the property remaining after the taking. Only distinct specific benefits are to be considered. Dupree did not specify the percentage of enhancements that were specific as opposed to the percentage of enhancements that were general. When asked how he calculated severance damages or the lack thereof, Willet stated: “Just a mathematical expression of a difference in the before and after value.”
Dupree admitted that had an investor purchased the remaining property in 1974 for the price that he had estimated it to be worth at that time, the investor “might not have made a very good deal” considering the slow development in the area. This illustrates the highly speculative nature of *26 the assertion that the landowner specially benefited by the project and, conversely, the validity of the premise that hindsight should not affect the calculation of severance damages. Furthermore, the calculations of the State’s experts are based on a before taking value in one quadrant of $1,600 per acre, substantially below Har-vill’s figure of $2,200 per acre which was accepted by the trial judge and approved by this court for that quadrant.
The burden of proving special benefits requires the State to show enhancements which specifically and directly benefit the landowner, as opposed to the general enhancements which benefit all landowners in proximity to the project.
An interstate exchange in and of itself is not a special benefit. State, Dept, of Hwys v. Westport Develop. Co., Inc., 332 So.2d 918 (La.App. 2d Cir.1976). Anderson, supra. Willet’s assertion that he had “never seen an instance where there hasn’t been appreciation of a diamond interchange anywhere in the State of Louisiana” was obviously and correctly found legally erroneous as well as not credible by the trial court.
The factors employed to determine the special benefit include:
1. The volume of traffic, both from the interstate and from the cross highways;
2. The position of the remainder with regard to being the most available for motorists leaving the expressway;
3. The visibility of the property to expressway motorists before they reach the exit ramp;
4. Readiness of access to and from the expressway and the entrance ramp;
5. The location of the interchange with regard to population center; and
6. Competing cites available at the time or nearby interchanges.
State, Dept, of Hys. v. William T. Burton Indus., Inc., supra, at p. 843.
With respect to the Burton Industries, Inc. factors in the instant case, Mr. Harvill testified that he viewed the placement of the landowner’s property at the interchange as only a general benefit because the landowner could only use the interchange as “everybody else in the city in north Louisiana uses it, same identical reason.” He further stated that volume on 1-220 for years “was just negligible, primarily, of course, because there was no bridge across Cross Lake.”
The assertions of Willet and of Dupree that the landowner’s properties now benefit from their proximity to the railroad, to U.S. Hwy. 80, to 1-20, and to Louisiana Downs race track are benefits that are common to all landowners in the area and are not special to this landowner.
The record supports these conclusions by the trial court:
It requires a person almost to look into the future and see what’s going to happen. And it requires him to say that a purchaser would place a value on the property because he would look into the future and see what was going to happen. This case is a little bit unusual in the sense that we’ve got — we’re twelve years past it. So we can look with hindsight and see what actually did happen, and we get a little bit different appearance from what someone would have had in nineteen seventy-four, when the taking was done, who would have been looking toward us. We’re looking back toward that taking. And of course we have another factor, that less than a year ago, a sale for a very large price was made on the property, which tends to support the theory that back in nineteen seventy-four the property had the enhanced value because purchasers looking to the future would pay more for the property. Had the case been tried in nineteen eighty-four, which would have been ten years after the taking, we wouldn’t have had that sale. In looking back ten years, there wouldn’t have been any — any such sale similar to that. The question is if you stand in nineteen seventy-four and look forward, how far do you look? I don’t think anybody knows that. I don’t — with all due respect to these four gentlemen here, they probably all four have different opinions about that, a difference of some degree at *27 least. I think that the Court would have to find that the owner, Mr. Módica, has proven some severance damages.
******
I think it is reasonable to say that there was severance damage — I think that the owner has shown that — to my satisfaction, that there was severance damage. And I think the State has shown that there was some enhanced value, which would have some sort of an offsetting effect. And I think the best figure that I can arrive that takes into consideration both the severance damage and the off— and the enhanced value is that of Mr. Harvill, forty-seven thousand, four hundred dollars ($47,400), and I’m going to make that award.
Willet’s rationale (as well as Harvill’s) that the landowner’s remaining property would become more valuable after the area developed simply because of the presence of the interchange again indicates a general benefit to all landowners fronting on Swan Lake Road.
We agree that severance damages of at least $47,400 were proved and that special benefits to offset such damages were not proved.
DECREE
For reasons given by the trial court, which we here adopt, and to the extent the law permits, we cast appellant with costs and AFFIRM the judgment.
SEXTON, J., dissents and assigns written reasons.
LINDSAY, J., dissents in part and assigns written reasons.